UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF LEON SMITHERS, et al.,

        Plaintiff,                  Case No. 05-40347

v.                                        District Judge Paul V. Gadola
                                          Magistrate Judge R. Steven Whalen

CITY OF FLINT, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

Before the Court are Defendants Murphree and Walker's *Third Renewed Motion for Summary Judgment* pursuant to Fed. R. Civ. P. 12(b)(6) and 56 [Docket #72] filed January 18, 2008 and Defendant City of Flint's Motion for Summary Judgment [Docket #73], filed January 31, 2008, which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). Oral argument was held on July 24, 2008. For the reasons set forth below, I recommend that both Motions be GRANTED and the Complaint DISMISSED WITH PREJUDICE..

### I. Background

Plaintiffs, Estate of Leon Smithers, by his personal representative, Homer Norris, Jr., Alan Sharp, and Robert Bonner filed suit in Genesee County Circuit Court on October 14,

-1-

2005, alleging constitutional violations pursuant to 42 U.S.C. §§1983, 1985(2) & (3) as well as state law claims in the events surrounding the fatal shooting of Leon Smithers on October 26, 2002.[1] The matter was removed to this Court on November 14, 2005. Plaintiffs make the following factual allegations.

At the time of his death, Leon Smithers was a resident of Ruth Avenue in Flint, Michigan. *Complaint, Docket #1* at ¶11. On October 26, 2002 at around 6:30 p.m., Smithers, at home in the company of Plaintiffs Alan Sharp and Robert Bonner, telephoned Defendant Flint Police Department [Flint Police], requesting the removal of Shirley Ewing Washington, Smithers' girlfriend. *Id*. at ¶12. Washington, having become intoxicated, had threatened to kill Smithers, Sharp, and Bonner, stating that she intended go home and "retrieve her nine millimeter handgun." *Id.* Washington also stated that "it would be the last time that [Smithers] would ever call the police on her." *Id.* Defendant Flint Police dispatched Defendant Officers Brian Murphree and Terrance Walker to the residence. *Id.* at ¶13. Defendant Officer Gacia also responded. *Id.* Upon the officers' arrival, Washington, "obviously intoxicated," was asked to leave by Smithers. *Id*. at ¶14. Washington repeated her statement that "this would be the last time that [Smithers] would call the police on her," and that if arrested, after being released, she would retrieve her gun, return to Smithers' house, and harm them. *Id.* When informed by Officers that she would be arrested if she

---

[1]On November 22, 2005, the Honorable Paul V. Gadola remanded Plaintiffs' state law claims of intentional infliction of emotional distress, gross negligence, and wrongful death to the Genesee County Circuit Court. *Docket #3*.
.

did not leave, Washington stated "'[f]*** -it, arrest me." *Id.* at ¶16. Washington's brother, Booker Washington, also present, heard her state that she was "'going to f*** y'all up when I get out of jail,'" as she was being handcuffed. *Id*. at ¶15. Washington, handcuffed, was placed in the back of a squad car."

Smithers, confident that the threat had passed, went inside, not bothering to lock his door. *Id*. at ¶17. In the meantime, Washington, having been released from custody after being ticketed for trespassing, returned to Smithers' house with a gun, fatally shooting Smithers and wounding Sharp. *Id*. at ¶¶18-19.

Plaintiffs allege that Defendant Officers, upon learning of the shooting, "conspired with one another and other officers in the department, in an attempt to hide . . . the fact that the death and injuries should have been prevented by the Flint Police Department and its officers." *Id.* at ¶20. Plaintiffs request monetary damages for "Defendants' negligent acts, failure to follow the proper procedures and . . . complete disregard of local, state and federal law and constitutional protections. *Id*. at ¶¶21-22. Specifically, Plaintiffs bring claims for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and for conspiracy.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint "for failure of the pleading to state a claim upon which relief can be granted." Rule 12(b) also provides that if, on consideration of a motion under paragraph (6), "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary

judgment and disposed of as provided in Rule 56 (summary judgment)." In assessing a Rule 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, and asks whether, as a matter of law, the plaintiff is entitled to legal relief. *Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir. 2001).

In *Bell Atlantic Corp. V. Twombley,*—U.S.—, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court set forth what a plaintiff must plead in order to survive a Rule 12(b)(6) motion. The Court held that although a complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level. . .on the assumption that all the allegations in the complaint are true." *Id.*, 127 S.Ct. at 1964-65 (internal citations and quotation marks omitted). Further, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (Internal citations and quotation marks omitted). *See also Association of Cleveland Fire Fighters v. City of Cleveland, Ohio* 502 F.3d 545, 548 (6th Cir. 2007). Stated differently, a complaint must "state a claim to relief that is *plausible* on its face." *Twombly*, at 1974 (emphasis added).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact.

*Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

### III. DISCUSSION

#### A. Due Process

The analysis of this case necessarily centers on a discussion of *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and its progeny. As with virtually all such cases, the facts are tragic, culminating in what, viewed in retrospect, might have been an otherwise preventable death. The underlying question is whether the failure of the police Defendants to arrest Shirley Washington for domestic violence, and their subsequent decision to release her from custody, violated either procedural or substantive due process.

##### 1. Procedural Due Process

Plaintiffs argue that viewing the facts in the light most favorable to them, as we must in a summary judgment motion, the Defendant officers on the scene would have been aware that this was a domestic violence situation, and therefore should have arrested Ms. Washington not for trespassing, but for domestic violence, M.C.L. § 750.81a(2). Had they done so, Plaintiff argues, Michigan law, specifically M.C.L. § 582a(1)(b), would have required that Washington be held without interim bond.

M.C.L. § 750.81a(2) provides:

> "(2) Except as provided in subsection (3), an individual who assaults his or her spouse or former spouse, *an individual with whom he or she has or has had a dating relationship*, an individual with whom he or she has had a child in common, or a resident or former resident of the same household without a weapon and inflicts serious or aggravated injury upon that individual without intending to commit murder or to inflict great bodily harm less than murder is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00, or both." (Emphasis added).[2]

M.C.L. § 764.15a provides for the warrantless arrest of an individual whom the police believe has violated § 750.81a:

> "Sec. 15a. A peace officer may arrest an individual for violating section 81 or 81a of the Michigan penal code, 1931 PA 328, MCL 750.81 and 750.81a, or a local ordinance substantially corresponding to section 81 of that act regardless of whether the peace officer has a warrant or whether the violation was committed in his or her presence if the peace officer has or receives positive information that another peace officer has reasonable cause to believe both of the following:

---

[2] M.C.L. § 764.15c(5)(b)(ii) defines "domestic violence incident" as "[a] crime committed by an individual against his or her spouse or former spouse, an individual with whom he or she has had a child in common, an individual with whom he or she has or has had a dating relationship, or an individual who resides or has resided in the same household." This reflects the language of M.C.L. § 81a(2).

> (a) The violation occurred or is occurring.
>
> (b) The individual has had a child in common with the victim, resides or has resided in the same household as the victim, has or has had a dating relationship with the victim, or is a spouse or former spouse of the victim. As used in this subdivision, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context."

Finally, M.C.L. § 780.582a provides that an individual arrested without a warrant under § 764.15a, or for a violation of § 750.81a, cannot be released on interim bond by the police:

> "Sec. 2a. (1) A person shall not be released on an interim bond as provided in section 1or on his or her own recognizance as provided in section 3a, but shall be held until he or she can be arraigned or have interim bond set by a judge or district court magistrate if either of the following applies:
>
> (a) The person is arrested without a warrant under section 15a of chapter IV of the code of criminal procedure, 1927 PA 175, MCL 764.15a, or a local ordinance substantially corresponding to that section.
>
> (b) The person is arrested with a warrant for a violation of section 81 or 81a of the Michigan penal code, 1931 PA 328, MCL 750.81 and 750.81a, or a local ordinance substantially corresponding to section 81 of that act and the person is a spouse or former spouse of the victim of the violation, has or has had a dating relationship with the victim of the violation, has had a child in common with the victim of the violation, or is a person who resides or has resided in the same household as the victim of the violation. As used in this subdivision, "dating relationship" means that term as defined in section 2950 of the revised judicature act of 1961, 1961 PA 236, MCL 600.2950."

While the Plaintiffs have not specifically used the words "procedural due process," they nevertheless suggest that given the mandatory nature of Michigan's statutory scheme, the Defendants' failure to comply with the laws and regulations applicable to domestic

violence was the proximate cause of Mr. Smithers' death, and resulted in a denial of due process.

First, § 750.81a provides that a police officer *may* arrest an individual charged with domestic violence. The permissive statutory language–which recognizes the discretion that is afforded the officer on the street–contradicts the Plaintiffs' argument that state law *required* the officers in this case to find that this was a domestic violence incident, or to arrest Washington for that offense if they did.

Plaintiff is of course correct that *if* Washington had been arrested for domestic assault, she would have been ineligible for station house bond, pursuant to M.C.L. § 780.582a. However, the mandatory nature of state or local statutes, regulations and policies does not vest the Plaintiffs with property or liberty interests subject to the protection of the Due Process Clause of the Fourteenth Amendment. In *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), also a domestic violence case, the Supreme Court was faced with a state statute, ostensibly written in mandatory terms, providing that "a peace officer shall arrest" a person whom he has probable cause to believe has violated a domestic restraining order. In rejecting a procedural due process claim,[3] and holding that the Colorado statutory scheme did not give rise to a protected property interest under the Due Process Clause, the Court stressed "[t]he deep-rooted nature of law-

---

[3] *Castle Rock* noted that in *DeShaney*, which was a substantive due process case, the Court left open the question of when a plaintiff would have a procedural due process claim.

enforcement discretion, even in the presence of seemingly mandatory legislative commands."

*Id.*, 545 U.S. at 761. Apropos to the present case, the Court observed:

> "It is hard to imagine that a Colorado peace officer would not have some discretion to determine that–despite probable cause to believe that a restraining order had been violated–the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance." *Id.*

Similarly here, notwithstanding any after-the-fact deposition testimony that this may have looked like a domestic violence situation, and regardless of the statutory and policy schemes in place for domestic violence, the police had the discretion to make their own judgment call on the scene, including the decision to arrest Washington for trespassing and remove her from the house.

Moreover, the Supreme Court in *Castle Rock* held that even if a state statute made enforcement mandatory, without regard to an officer's discretion, it would not give an individual "an entitlement to *enforcement* of the mandate." *Id.* at 765 (emphasis in original).[4]

Finally, *Castle Rock* held that even if the statute did confer an individual entitlement to enforcement, that would not constitute a "property interest" that would come within the purview of the Due Process Clause. *Id.* At 766-67.

Thus, *Castle Rock* lays to rest any claim the Plaintiffs have based on procedural due process.

### 2. Substantive Due Process

---

[4] As in *Castle Rock*, the Michigan statute itself grants no entitlement to individuals.

*DeShaney* held that the Due Process Clause does not "require [ ] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.*, 489 U.S. at 195. In *DeShaney*, the State first took temporary custody of a young child, but later returned him to his abusive father, who beat him to the extent that he suffered severe and irreversible brain damage. As tragic as this result was, and as grossly incompetent and negligent as the state authorities appear to have been, the Supreme Court declined to find a due process violation, stating, "that the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all." *Id.* at 201.

In so holding, the Court implied that there could be a due process violation if state action made an individual more vulnerable to harm. This has come to be known as the "state-created danger" exception to *DeShaney*, and was described by the Sixth Circuit in *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) as applicable where the state "cause[s] or greatly increase[s] the risk of harm to its citizens...through its own affirmative acts." A state-created danger claim has three elements:

> " '(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.' " *Jones v. Reynolds,* 438 F.3d 685, 690 (6th Cir.2006) (quoting *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir.2003)).

It is on the "affirmative act" factor that Plaintiffs' claim falters. Plaintiffs argue that

the affirmative act occurred when the police released Washington from custody on the trespassing charge, rather than applying the domestic violence statutes and denying interim bond, which would have resulted in her incarceration for at least 20 hours. However, an examination of relevant case law demonstrates that releasing Washington was not the type of affirmative act that, under *DeShaney* and *Kallstrom*, either created or increased the risk to Mr. Smithers.

In *Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007), one Chrissy Lucero drove to the house of her ex-boyfriend, Frank Offrink, creating a disturbance. She was highly intoxicated. Offrink's mother called the police, who ordered Lucero, visibly drunk and sitting in her car in the driveway, to leave, informing her "that she had '10 seconds to get out of [t]here.'" *Id.* at 444. Lucero drove away, and about 10 minutes later crashed into Sami Koulta's car, killing him. The Sixth Circuit held that neither the police officers' failure to administer a breathalyzer test and take Lucero into custody, nor their order for Lucero to leave created or increased the risk that someone would be injured by a drunk driver:

> "The officers' failure to administer a breathalyzer test (or otherwise to determine the extent of Lucero's drinking) before ordering her to leave the property may well have been negligent, but it did not "create" or "increase" the danger-of Lucero drinking and driving-that pre-dated their arrival on the scene. The same is true of the officers' decision to order Lucero to leave the property. Consistent with the homeowner's understandable request, the officers told Lucero to "go home" when they arrived at the Offrink's home, JA 168, and, when Lucero did not leave after saying she would, they ordered her to leave the property immediately. The claimant cannot maintain that Lucero never would have been drinking and driving that night but for the officers' conduct-given her acknowledged behavior before they arrived. And the claimant cannot maintain that Lucero would not have driven to the scene of the accident but for the officers' conduct. As Lucero acknowledges, the officers told her to "go

home" when they first arrived and later ordered her to leave the property. Neither directive *required* Lucero to drive home if she lacked the capacity to do so. Nothing prevented her either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.

"In the final analysis, Lucero's admitted proclivity to drink and drive that evening placed Koulta (and other people using the roadways) in as much danger before the officers arrived as afterwards. And much as the officers were in a position to head off the tragedy that materialized minutes later, a reality (and memory) that no court decision will eliminate, their conduct was no more an affirmative risk-creating act than the conduct of the officers in *DeShaney* (who returned an abused child to the custody of his abusive father) or *Bukowski* (who returned a mentally disabled girl to the stranger who had been sexually abusing her)." *Id.*, 446-47.

In the present case, Washington's proclivity for violent mischief was clear even before the police were called. In fact, the police were called because Washington was very intoxicated, loud and disruptive. There is testimony showing that she made threats even while the officers were present, including the statement, "If you take me to jail, I'm going to come back and kill 'em." Plaintiffs claim that Washington said that "this [was] the last time they would call the police," indicating that her anger was based not just on her arrest, but on the fact that the police were called in the first place. Like the police in *Koulta*, these Defendants were faced with a discretionary decision: leave this drunk, obnoxious and possibly violent person at the scene, or take her into custody? As the Court explained in *Castle Rock*, the long-standing discretion given to police on the scene is embedded in our jurisprudence.[5] The initial "affirmative act" the police undertook–arresting Washington and

---

[5] In response to the Defendants' position that they had the discretion to arrest Washington for trespassing, rather than for domestic violence, the Plaintiffs argue, at p.9

removing her from the house–had the immediate effect of reducing, not augmenting the risk of violence. Without resorting to pure speculation, their later act of releasing her did not put Smithers at any greater risk than he faced if the police had simply done nothing, or if she had been released 20 hours later.

Plaintiffs rely on *Smith v. City of Elyria*, 857 F.Supp. 1203 (N.D. Ohio 1994), where the court found that police action either created or increased the danger to a domestic homicide victim. In *Smith*, despite pleas from the victim to remove her former husband from the house because of his violence and threats of violence, the police told her it was a "civil matter," and actually encouraged the ex-husband to stay in the house, telling him to "throw his clothing back in the house if Karen threw it out." *Id*. at 1210. Noting that "[t]he state must take some action which places the victim in a dangerous position, or increases the potential danger, or deprives the victim of is or her ability to use self-help," the Sixth Circuit found that this affirmative act placed the victim at greater risk:

> "[T]he facts here support a claim that the police officers' *affirmative acts* created or increased the danger to Karen Guerrant. The police officers did not merely fail to perform their duties; they told Alfred Guerrant that he did not have to leave, and advised him to go back if Karen tried to throw him out. Thus, this case is more akin to the facts in *Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277 (6th Cir.1987), in which the police authorized an inmate to use a marked patrol car, and the inmate used the apparent authority of the police to stop an automobile and murder the occupants. Here, Alfred

---

of their response, "However, this ignores the duty that the officers had to protect the life, liberty and property of its citizens so that when Ewing (Washington) threatened Plaintiffs' life, liberty and property, they had a duty to act." If Plaintiffs are claiming that this "duty to protect" gives rise to a protected interest under the Due Process Clause, *DeShaney* clearly holds otherwise.

used the apparent authority given to him by the police to remain in his ex-wife's home against her will, and later killed her." (Emphasis in original). *Id.*, at 1210.

In the present case, the Defendants did nothing to affirmatively encourage or embolden Washington in a way that increased a risk that existed before they arrested her or that would have existed had they done nothing at all. Nor did the police deprive Mr. Smithers or the other residents of the house of their ability to use self-help. While they may have *assumed* that Washington would remain in police custody, they could not have known how long she would be detained, and nothing the police did or said precluded self-help measures, such as securing the house.

Plaintiffs also rely on *Reed v. Gardner,* 986 F.2d 1122 (7th Cir.1993). In *Reed*, the Seventh Circuit found an increased risk where "[police officers] removed a driver, who it must be inferred was sober, and left behind a passenger, whom they knew to be drunk, with the car keys." *Id.*, 1127. By leaving the keys with the drunk passenger, the police effectively gave him a loaded weapon that, except for that affirmative act, he would not have had. In *Koulta*, *supra*, 477 F.3d at 447, the Sixth Circuit distinguished *Reed* as follows:

> "In *Reed,* the Seventh Circuit held that the claimant satisfied the requirement when officers arrested a sober driver, took her into custody and left the keys with her visibly drunk husband. *See* 986 F.2d at 1126. There, unlike here, the risk that the husband would drive while drunk did not exist until the officers took the wife into custody and prevented her from continuing to drive the car."

*Koulta* likewise distinguished *Pena v. DePrisco,* 432 F.3d 98 (2d Cir.2005), stating, "There, unlike here, the on-duty officers increased the driver's level of impairment (by condoning his drinking) and increased the risk that he would drive while impaired (by

-14-

requesting rides from him)." *Koulta*, 477 F.3d at 447.

Unlike the present case, *Reed, Pena* and *Smith* all involved situations where the police affirmatively encouraged, emboldened or enabled a dangerous individual, thereby creating or increasing a level of risk that would not otherwise have been present. Had the Defendants in this case told Washington to remain in the house, as in *Smith*, or given her a weapon, as in *Reed*, or encouraged or condoned her erratic behavior, as in *Pena*, the Plaintiffs might have a viable due process argument. But they did none of these things. Indeed, this case is factually more similar to *DeShaney*, where the state returned a child to his abusive father. While one could arguably call that an affirmative act, comparable to releasing someone from custody, the Supreme Court found that fact insufficient to sustain the plaintiff's claim, stating:

> "The mere fact that the State is aware that a person is in danger does not create a duty to protect, even if the State expresses willingness to protect the victim." *Id.*, 489 U.S. at 197-98, n.4.

Accordingly, Plaintiffs' substantive due process claim must be dismissed.

### 3. Qualified Immunity

Defendants argue that they are protected by qualified immunity. Qualified immunity is an affirmative defense. Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), a state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the Defendant's position would know that the conduct complained of was unlawful. Under *Saucier*, the inquiry is sequential, that is, the district

court must first consider whether there was a constitutional violation.[6] *See also Baranski v. Fifteen Unknown Agents of the BATF,* 452 F.3d 433, 438 (6th Cir.2006) (en banc).

Once a defendant has met the burden of affirmatively pleading the defense, the ultimate burden of proof is on the plaintiff to show that a defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

As discussed above, there was no constitutional violation in this case. This being the threshold inquiry under *Saucier*, the Defendants are entitled to qualified immunity. In addition, the Defendants' exercise of police discretion, as officers on the scene of a developing and uncertain situation, was objectively reasonable. *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6th Cir. 2002).

### B. Conspiracy

Plaintiffs have alleged a civil conspiracy under 42 U.S.C. §§ 1985(2) and (3). The Defendants argue that this claim (Count 2 of the Complaint) must be dismissed under Fed.R.Civ.P. 12(b)(6), based on the intracorporate conspiracy doctrine, which holds "that when two or more employees of the same employer are acting within the scope of their employment, they are not two separate people to form a conspiracy." *Defendants' Brief*, p.16. Defendants correctly cite *Hull v. Cuyahoga Valley Joint Vocational School Dist.*, 926 F.2d 505, 509-10 (6th Cir. 1991) and *Wcisel v. City of Utica*, 2005 WL 3478355 (E.D. Mich. 2005)(Gadola, J.), for the proposition that the intracorporate conspiracy doctrine applies to

---

[6] The Supreme Court has granted certiorari in *Pearson v. Callahan*,__S.Ct.__, 2008 WL 754340, directing the parties to brief and argue whether *Saucier* should be overruled.

claims brought under 42 U.S.C. §§ 1985(2) and (3). In their reply, the Plaintiffs have cited absolutely no case law or other authority to the contrary. The conspiracy count must be dismissed.

### C. Equal Protection

Plaintiffs' equal protection argument is premised on the theory that the Defendants treated their situation differently from other domestic violence situations because the aggressor here was female, and the incident occurred in a poor neighborhood. The claim is based partially on testimony from Plaintiffs Sharp and Bonner (Defendants' Exhibit 1, p.27, and Exhibit 2, p. 39-40). That testimony is highly speculative, and not grounded in any objective facts. The Plaintiffs also rely on statistics purportedly comparing male-female offender rates (not restricted to domestic violence cases) in Genesee County and Wayne County. Neither the statistics and the Plaintiffs' deposition testimony come close to satisfying their burden of demonstrating facts sufficient to overcome summary judgment. *Celotex Corp., supra.*

### D. City of Flint

In *Monell v. Department of Social Services of City of New York* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that under § 1983, municipal liability is not unlimited, and that a municipality could not be liable on a theory of *respondeat superior*: "A municipality cannot be held liable *solely* because it employs a tortfeasor - - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*, 436 U.S. at 691, 2036. (Emphasis in original). However, the *Monell* Court

found that when the acts of individual employees represent the government's custom or policy, the municipality can be held liable. *Id* at 638, 2037-2038.

Nevertheless, a municipal policy need not be formal or written to bring § 1983 into play. It can be found in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)(citations omitted). In addition, § 1983 liability can be based on a policy of inadequate training or supervision, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In this case, as discussed above, there was no underlying constitutional violation; hence, there can be no municipal liability. Nor has the Plaintiff shown a triable issue of fact as to whether the City of Flint has policies, written or unwritten, that work to deny constitutional rights, or that police training is so inadequate as to result in constitutional violations.

Therefore, the claims against the City of Flint, as well as the individual Defendants, must be dismissed.[7]

## IV. CONCLUSION

---

[7] Because all of Plaintiffs' claims must be dismissed on the merits, it is unnecessary to discuss Defendants' additional argument that Defendant Bonner lacks standing to bring suit. *See Defendants' Brief*, p.15.

For these reasons, I recommend that both Defendants Murphree's and Walker's motion for summary judgment [Docket #72] and Defendant City of Flint's motion for summary judgment [Docket #73] be GRANTED, and the Complaint DISMISSED WITH PREJUDICE.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.CT. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                S/R. Steven Whalen
                R. STEVEN WHALEN
                UNITED STATES MAGISTRATE JUDGE

Dated: September 2, 2008

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 2, 2008.

                S/G. Wilson
                Judicial Assistant